### 33095. RAY v. THE STATE.

Decided October 26, 1950.

*Briggs Carson Jr.*, for plaintiff in error.

*J. Bowie Gray, Solicitor-General*, contra.

MacIntyre, P. J.   Charles Ray was indicted for assault with intent to murder Willie D. Lindsey.   Upon his trial he was convicted of "shooting at another" and his punishment was fixed at not less than one year and not more than four years in the penitentiary.   His motion for a new trial, based upon the usual general grounds and two special grounds, was overruled and he excepted.

■ While it appeared from the evidence that the defendant and the prosecutor were good friends and on the best of terms at the time of the shooting, and though the evidence does not reveal any *motive* for the shooting, there was sufficient evidence to authorize the verdict of guilty of shooting at another.   The prosecutor, Willie D. Lindsey, testified that on the evening on which he was shot by the defendant he had gone into the defendant's place of business and the defendant "was down on his knees—looked like he was asleep, and I touched him on his hat to attract his attention and also to let him know that I was going to the lavatory.   He reached for his pistol, thumb cocked it, and shot me above the waist."   At one point in the cross-examination the prosecutor testified:   "I was not accidentally [shot]—but intentionally shot, and what I want to know is why he did shoot me  .  .   Well, that's the way he done it—just looked right at me and shot me."   At one point in his statement to the jury the defendant stated:   "When he [the prosecutor] asked me about going to the rest room, I told him someone was back there.   He tipped me on the hat and said, 'What.'   I said, 'Someone is back there.'   He says, 'I'm coming back there and get you,' and I says, 'Go on boy, don't fool with me.'   I reached down for the gun—the gun was in a sack—and if I had wanted to done anything to the man, I was in my own place."   From this evidence the jury were authorized to infer that the defendant pointed the pistol at the

prosecutor, pulled the trigger, and fired, striking the prosecutor, and that the defendant intended to shoot the prosecutor. The evidence authorized the verdict of shooting at another not in his own defense, and the court did not err in overruling the motion for a new trial on the general grounds.

■ The court charged specifically on the law of assault with intent to murder and that there must be a specific intent to kill before the jury could find the defendant guilty of an assault with intent to murder; the court then charged the jury on the law of shooting another not in one's own defense in which the court charged that the shooting must have been intended but was not done with intent to kill; and thereafter the court charged on the law of accident, "A person shall not be found guilty of any crime or misdemeanor committed by misfortune or accident, and where it satisfactorily appears there was no evil design, or intention, or culpable neglect," which latter charge is in the language of Code § 26-404. Bearing in mind that the court had already dealt specifically with the question of intent as it related to the offense of assault with intent to murder and as it related to the offense of shooting at another not in one's own defense, we think it was not reversible error for the court, in connection with those instructions, to charge further on the law of accident that: "an accident is an event that takes place without one's foresight or expectation. That which takes place or begins to exist without design. To absolve one from guilt of crime, it must not only appear that there was no evil design, but that there was no culpable neglect. And, in that connection, the court charges you that, if you find that the defendant pointed a weapon at the deceased [prosecutor?] and pulled the trigger and fired, then the result of such conduct, under the law, would not be an accident."

The jury could not have been misled by the obvious verbal inaccuracy, resulting from a "slip of the tongue," in the court's inadvertent use of the word "deceased" instead of "prosecutor." The prosecutor was present in the courtroom, testified on the stand as the person who had been shot by the defendant, and obviously was not deceased. The word which was changed inadvertently by the court does not so obscure the sense of the charge that a juror or person of ordinary intelligence could

not have ascertained the court's meaning with certainty and a new trial cannot be granted for this slip of the tongue which was corrected by the necessary intendment of the court's instructions. *Walraven* v. *Walraven*, 76 *Ga. App.* 713, 719 (47 S. E. 2d, 148).

▓ We think that under the charge as a whole the jury understood that if it found that the defendant pointed a pistol at the prosecutor intending or not intending to kill him and pulled the trigger and fired, the result of such conduct would not be an accident; and, that if the intent to kill was absent they would not be authorized to find the defendant guilty of assault with intent to murder; but that they might, if in their opinion, the facts, under the law as given them in charge, justified it, convict him of the offense of shooting at another not in his own defense, and obviously the jury so understood as it returned a verdict of guilty of shooting at another. *Baker* v. *State*, 12 *Ga. App.* 553 (3) (77 S. E. 884); *Cook* v. *State*, 93 *Ga.* 201, 202 (18 S. E. 823); *Pool* v. *State*, 87 *Ga.* 527 (13 S. E. 556); *Wallace* v. *State*, 95 *Ga.* 470 (20 S. E. 250); *Leonard* v. *State*, 133 *Ga.* 435 (66 S. E. 251); *Browning* v. *State*, 31 *Ga. App.* 150 (3) (120 S. E. 649). This charge was not erroneous for the reason urged by the defendant that it "placed an undue burden on the defendant by the complete elimination from the consideration of the jury of intent, design, and culpable neglect thereby making the pointing of a pistol, without intent, design, and culpable neglect, the pulling of a trigger and firing of a pistol without evil design and culpable neglect, [a] crime under the laws of Georgia."

▓ Special ground 2 is based upon the theory of newly discovered evidence. It appears from the record that Willie D. Lindsey, the prosecutor, testified in part: "Dr. Carl Pittman treated me at the Tift County Hospital where I was laid up for twenty-eight (28) days as a result of this wound. My bill totaled $766 and a few cents. Charles Ray [the defendant] gave me no indication as to why he shot me, other than my going in there and tapping him on the hat and asking him if I could go to the lavatory? . . As I know of, there was no horseplay or fun. I did not make the remark to Charles— 'I am coming back there and get you.' The pistol was not in

a paper sack and he wasn't playing—it was in his hand and he thumb cocked it and shot me  .  .  I was not accidentally— but intentionally shot, and what I want to know is why he did shoot me?  Well, that's the way he done it—just looked right at me and shot me."

Mose Alexander, a witness for the State, testified in part: "What happened in my presence—when we walked in—we walked in the door and Charles was leaning on the counter, like this—I don't know what he was doing, and Willie D. tipped him on the hat and I heard the pistol say, 'Bow,' and then Willie D. says, 'Boy, you done shot me,' and then Charles said, 'Take him to the hospital.'  And us took him to the hospital in my car—that's all I knows—Willie D. and I were going back to the rest room.  I reckon Willie D. mentioned it to him—he tipped him on the hat—I reckon he thought he was sleep but he was not sleep.  He only said that he was going in the back."

Irene Collins, a witness for the defendant, testified in part: "Charles Ray [the defendant] was sitting behind the counter kinder to the back, writing.  Willie D. [the prosecutor] came in and went behind the counter, playing and hit Charles, like he usually does.  I was behind the counter also, but I don't know how long he was back there before the pistol went off. Yes, a bunch of others were there, and I do work there.  What happened then was—Well, Willie D. said, 'Charles, you done shot me,' and he said, 'Take him to the hospital and tell them to 'phone me and I will pay it.' "

Ed Fowler, a witness for the defendant, testified in part: "Charles was sitting on a stool behind the counter.  He and a crowd of boys had been playing around all the afternoon, and I saw Willie D. and them come in and go on by laughing.  I turned my head and the gun went off  .  .  I didn't see the pistol that night and I don't know where it was.  I heard no fighting 'cause everybody was happy, and I heard no words of anger afterwards.  Willie D. left there in a good humor— smiling.  He didn't want to go to the hospital but Charles insisted that he go."

Walter Evans, a witness for the defendant, testified in part: "I didn't exactly see Lindsey [the prosecutor] come in but I heard him speak to Charles when he entered.  Charles was

sitting behind the counter and Lindsey ask him about using the rest room, but I didn't see the pistol but I heard it go off. They had been playing and teasing but, at this time, Charles was writing in a book. They had not been fighting or anything like that, but after the shooting, Charles told me to take him to the hospital and he would pay the expenses. Yes, I heard him ask if he could go to the latrine. The shooting followed in a few seconds. I didn't hear Willie teasing anybody—just ask if he could go the rest room, and that is all I heard—I heard the pistol fire, but I never did see it."

In his statement to the jury the defendant said in part: "Willie D. came in and we spoke as we have always done. We have always been good friends and I have never had anything against him—I still don't. When he asked me about going to the rest room, I told him someone was back there. He tipped me on the hat and said, 'What.' I said, 'Someone is back there.' He says, 'I'm coming back there and get you,' and I says, 'Go on boy, don't fool with me.' I reached down for the gun—the gun was in a sack—and, if I had wanted to done anything to the man, I was in my own place, but I had nothing against him, and, when the gun went off, it scared me—I didn't even know it was my gun—and he said, 'Boy, you done shot me.' I looked up and saw the blood. I wouldn't have done it for nothing and I said, 'You go to the hospital,' and he said it was nothing but his arm. We thought it was his arm and I said, 'Go on to the hospital and I will pay the bill.' . . And God knows I ain't mad with him, and it was just a accident, and I ask the court to have mercy on me for that's all it was—just a accident."

The alleged newly discovered evidence upon which the defendant asks for a new trial in this ground is that of Dr. Carl Pittman Jr., who attended the prosecutor in the hospital at the time he was suffering from the wound in question. Dr. Pittman states in his affidavit that during the course of his examination of the prosecutor, he asked the prosecutor how he happened to be shot and the prosecutor replied: "We were just playing and I got shot." We think that this evidence by Dr. Pittman, tending to support the defendant's plea of accident, does not relate to new and material facts, but is merely an addition to

the evidence already obtained from the defendant's witnesses, Collins, Fowler, and Evans, all of whom were present at the time of the shooting and whose testimony on the trial related to the defendant's plea of accident. Furthermore, this evidence by Dr. Pittman would be merely impeaching in character as tending to contradict the prosecutor and one of the State's witnesses, Mose Alexander, upon the questions of the defendant's plea of accident. The trial judge was warranted in overruling this ground of the motion for a new trial as the evidence was merely cumulative and impeaching in character and would probably not produce a different result on another trial. *Morris v. State*, 54 *Ga. App.* 263 (187 S. E. 674); *Johnson v. State*, 196 *Ga.* 806 (27 S. E. 2d, 749). This ground of the motion for a new trial is without merit.

*Judgment affirmed. Gardner and Townsend, JJ., concur.*